# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 29 2004

(LUTHER D. THOMAS, CLERK
BY:
Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

JOHN RAMSEY, PATSY RAMSEY, and )
BURKE RAMSEY, a minor, by his )
next friends and natural parents,)
JOHN RAMSEY and PATSY RAMSEY, )
                         )
    Plaintiffs,           )    CIVIL ACTION FILE
                         )
vs.                   )    NO. 1 03 CV-3976 (TWT)
                         )
FOX NEWS NETWORK, L.L.C., d/b/a )
Fox News Channel           )
                         )
    Defendant.         )

**PLAINTIFFS' RESPONSE TO DEFENDANT'S
MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a)**

### I.   INTRODUCTION

On December 23, 2003, plaintiffs John and Patsy Ramsey and their minor son Burke ("plaintiffs") filed this action for defamation arising out of a December 27, 2002 broadcast of a false and defamatory television news segment by defendant Fox News Network, L.L.C. d/b/a Fox News Channel ("Fox") about the 1996 murder of JonBenét Ramsey ("the Ramsey segment"). On February 17, 2004, plaintiffs timely filed their First Amended Complaint for Defamation ("the Amended Complaint").

Fox admits venue in this district is proper. Def.'s Memo. at 6.



John and Patsy Ramsey are the parents of JonBenét Ramsey, the six-year-old child murdered by an unknown assailant in December of 1996 in Boulder, Colorado. Burke is now 16 years of age. By its own admission, Fox is "the number-one rated, 24-hour a day, 7-day a week <u>national</u> cable television news network." Def.'s Memo. at 4 (emphasis added).

Plaintiffs' claims arise out of the following false and defamatory statements uttered by Fox reporter Carol McKinley ("McKinley") in the Ramsey segment:

> Detectives say they had good reason to suspect the Ramseys. The couple and JonBenét's nine-year-old brother, Burke, were the only known people in the house the night she was killed. JonBenét had been strangled, bludgeoned and sexually assaulted, most likely from one of her mother's paintbrushes. The longest ransom note most experts have ever seen – three pages – was left behind. Whomever killed her spent a long time in the family home. Yet, there has never been any evidence to link an intruder to her brutal murder.

Amend. Compl. at ¶ 29.

The Fox motion to transfer conveys the idea that this case is factually complicated. Actually, the underlying factual issues in this defamation action are quite simple. Plaintiffs allege that the Ramsey segment falsely conveyed (1) that detectives had good reason to consider Burke Ramsey a suspect in connection with the murder of his sister before "clearing" him and (2) that one or more of the plaintiffs was likely involved

in the murder because they were the only individuals known to be in the house the night of the murder and there had never been any evidence linking an intruder to the murder.

In fact, detectives never had any reason to suspect Burke and he was never even a possible suspect. Burke was not investigated and "cleared". *See* Amend. Compl. at ¶¶ 35-39. Further, compelling evidence exists which links an intruder to the murder. Amend. Compl. at ¶¶ 40-41, 51, 52.

At the time the Ramsey segment aired, plaintiffs lived in Georgia, having moved here in July of 1997. They continued to reside in Georgia for 9 months after the broadcast of the Ramsey segment, moving to Michigan in September of 2003. The Ramseys still own a house in the Atlanta area and many, if not most of, their relatives and friends live in the Atlanta area. Many of individuals are potential witnesses with respect to events surrounding the murder investigation and the issue of damages. Decl. of Wood at ¶ 6.

## II.  LEGAL ANALYSIS

The core question presented by this motion is whether plaintiffs' choice of the Northern District of Georgia as the forum for this action creates problems of convenience for Fox and its witnesses of such a substantial nature that transfer is appropriate in the interests of justice. Pilkington v. United

Airlines, Inc., 855 F. Supp. 1248, 1250 (M.D. Fla. 1994). In support of its motion, Fox relies predominately on its contention that Fox employees with knowledge of the production of the Ramsey segment and "key witnesses" in the murder investigation live in Colorado.

**A.    Fox Has Failed to Demonstrate That Balancing the Convenience to the Parties, Witnesses and the Interests of Justice Weighs Heavily In Favor Of Transfer**

A motion to transfer venue is governed by 28 U.S.C. § 1404(a) which states: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district where it might have been brought." 28 U.S.C. § 1404(a) (2004); Van Dusen v. Barrack, 376 U.S. 612, 616 (1964).

When seeking a change of venue pursuant to § 1404(a), "[t]he movant has the burden of making a strong case" for transfer." Grey v. Continental Marketing Assoc., Inc., 315 F.Supp. 826, 831 (D.C. Ga. 1970). "The plaintiffs' choice of forum should not be disturbed unless the movant can show that it is clearly outweighed by other considerations." Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 259 (11th Cir. 1996) quoting Howell v. Tanner, 650 F.2d 610, 616 (5th Cir. 1981). In order to overcome the presumption in favor of plaintiffs' choice of

forum, Fox must show the balance of conveniences is "strongly in
favor" of the transfer. Pilkington, 855 F. Supp. at 1249.

"[I]f the transfer would merely shift inconvenience from
one party to the other, or if the balance of all factors is but
slightly in favor of the movant, plaintiffs' choice of forum
should not be disturbed and transfer should be denied." Grey,
315 F. Supp. at 831.

### 1.  **Convenience of Parties**

"The plaintiff's choice of forum should not be disturbed
unless it is clearly outweighed by other considerations."
Robinson, 74 F.3d at 260. Fox suggests that the weight of this
often-times dispositive factor is lost here because the
operative facts took place in Colorado and many potential
witnesses reside there. Fox further asserts that plaintiffs'
only connection to Georgia is the fact that their attorney is
located in Atlanta.

In fact, added weight should be accorded to plaintiffs'
choice of forum because plaintiffs lived in Atlanta at the time
of the broadcast of the Ramsey segment. Additionally, (1) the
cause of action arose in Georgia; (2) many potential witnesses
for plaintiffs reside in Georgia; (3) Fox maintains an active
business presence in Georgia; and (4) McKinley traveled to

Georgia on several occasions to investigate and report on the Ramsey case. Decl. of Wood at ¶¶ 5, 6, 10, and 11.

In contrast, Fox is a multi-billion dollar corporate conglomerate which conducts business for profit throughout the United States, including in Georgia. In an effort to avoid being haled into court in Georgia for defaming Georgia residents by its broadcast of the Ramsey segment in Georgia, Fox offers little more than self-serving, speculative and conclusory hearsay statements of inconvenience.

### 2.    The Cause of Action Arose In Georgia

Fox contends that the operative events of this case occurred in Colorado because the murder of JonBenét Ramsey and the investigation into the murder took place in Colorado.[1] Fox's argument is a distraction from the reality that the operative facts concern the tort of defamation, not the murder of JonBenét or its investigation. While the subject of the Ramsey segment was the murder of JonBenét, the tort of defamation is the basis for this lawsuit and that tort occurred in Georgia.

This litigation resulted from Fox's publication of false and defamatory statements about Georgia residents, not from a Colorado murder or its investigation. While Fox asserts that the

---

[1] Actually, a considerable amount of investigative work was conducted by Colorado officials in the State of Georgia working at times with Georgia law enforcement officials. Decl. of Wood ¶ 9.

Ramsey segment was "researched, written and prepared" by Fox employees "who live and work in Colorado," (Def. Memo. at 10), research, writing, and editing and the other acts identified by Fox are not "key events" which led to the filing of this lawsuit because they do not give rise to a claim for defamation. Such actions do not even constitute tortious conduct, as false and defamatory statements only become actionable when published. Sigmon v. Womack, 158 Ga. App. 47, 50 (1981).

The operative events in this case occurred in the Northern District of Georgia because that is a venue where the defamation was published and is the venue where plaintiffs lived at the time of publication and accordingly, is the venue where plaintiffs suffered the greatest harm to their reputations as a result of the broadcast. It is well established that the locus of a tort is determined by the place where the plaintiff suffered injury. Risdon Enter., Inc. v. Colemill Enter., Inc., 172 Ga. App. 902, 903 (1984) ("[t]he general rule is that the place of wrong, the locus delicti, is the place where the injury sustained was suffered rather than the place where the act was committed").

Additionally, the act of publication has been deemed "an integral part of the act constituting the basis for a cause of action for libel" as it "entails the ability to control the

- 7 -

libel . . . [which] ability is retained until the moment of delivery." Southern Bell Telephone and Telegraph Co. v. Coastal Transmission Serv., Inc., 167 Ga. App. 611, 615 (1983); see also Stepanian v. Addis, 782 F.2d 902, 903 (11th Cir. 1986) (cause of action for libel arose where defamatory statement was circulated). "In a defamation action, the 'tortious act' occurs in the state where the alleged libelous material is distributed." Spelsburg v. Sweeney, 514 F. Supp. 622, 625 (S.D. Ga. 1981); Process Control Corp. v. Witherup Fabrication and Erection, Inc., 439 F. Supp. 1284, 1286 (N.D. Ga. 1977) (holding that the tort of defamation occurred in Georgia where tortious letter was prepared in Pennsylvania and mailed from Pennsylvania to Georgia, and stating "the 'tortious act' in a defamation action occurs at the place where the libelous material is delivered and circulated."); Wachtel v. Storm, 796 F. Supp. 114, 116 (S.D.N.Y. 1992) (venue proper in defamation case where defamatory material was published in the same district). Here, Fox does not and cannot dispute that it broadcast and published the Ramsey segment in Georgia. Fox knowingly broadcast the Ramsey segment in the state of the plaintiffs' domicile and should be expected to be haled into court in the place where it caused the greatest degree of damage. See Calder v. Jones, 465 U.S. 783,789, 104 S. Ct. 1482,1487-88 (1984) (where defendant's

"intentional, and allegedly tortious actions were expressly
aimed at (plaintiff's home state)..." and where defendant
published article "that they knew would have a potentially
devastating impact upon (plaintiff)...(defendants) must
'reasonably anticipate being haled into court there' to answer
for the truth of the statements made in their article." quoting
World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100
S.Ct.559,567 (1980).

    In support of its argument as to the convenience of the
parties, Fox cites numerous cases in which venue was allegedly
transferred due to the fact that the plaintiffs did not *reside*
in their originally chosen forum. However, an examination of the
cited cases reveals that in most cases, not only did the
plaintiff not reside in its chosen forum, but often times, had
*never* resided in the chosen forum at all. *See* cases cited by
Fox: Haworth , Inc. v. Herman Miller, Inc., 821 F. Supp. 1476,
1478 (N.D. Ga. 1992) (transfer appropriate where both plaintiff
and defendant were Michigan corporations with headquarters in
Michigan and where all operative events took place in Michigan);
Aeroquip Corp. v. Deutsch Co., 887 F. Supp. 293, 294 (S.D. Ga.
1995) (transfer appropriate where plaintiff was a Michigan
corporation with no special ties to Georgia); McClain v.
Camouflage Associates, 1994 WL 570874 (E.D. Pa. 1994) (transfer

appropriate where plaintiff had absolutely no ties to *chosen* forum and all operative facts took place *outside forum*).

Fox also relies on cases *where* transfer was deemed appropriate due to the *fact* that no operative facts occurred in the plaintiff's chosen *forum*. *See* <u>Holmes v. TV-3, Inc.</u>, 141 F.R.D. 697, 698 (defamatory broadcast reached only a scant *number of viewers* in plaintiff's chosen forum); <u>Bell v. K Mart Corp.</u>, 848 F. Supp 996, 998-999 (transfer appropriate where plaintiff's claims did not arise in chosen forum); <u>Haymon v. Ply Gem Indus., Inc.</u>, 1996 WL 145845 (N.D. Ill. 1996) (case transferred where no operative facts occurred in chosen forum); <u>Kachal, Inc. v. Menzie</u>, 738 F. Supp. 371, 373 (Dist. Nevada 1990) (case transferred where *all* witnesses lived outside forum and *no* operative facts occurred in chosen forum).

### 3.   **Plaintiffs maintain significant contacts in Georgia.**

Plaintiffs maintain significant contact with their chosen forum. The Ramseys still own a home in Georgia. See Decl. of Wood at ¶ 5. Plaintiff John Ramsey's brother and sister-in-law reside in the Atlanta metro area. <u>Id.</u> Plaintiff Patsy Ramsey's, father, stepmother and two sisters also live in Atlanta. <u>Id.</u> Additionally, as plaintiffs resided here for many years before moving to Colorado in 1991 and after returning in 1997, they

have many friends in Georgia, many of whom are familiar with the damages suffered by plaintiffs.

Plaintiffs have virtually no contacts in Colorado since moving from that state almost 7 years ago. Thus, plaintiffs' numerous contacts within this district will lessen their expense of prosecuting their claims as they will not have to stay in hotels for extended periods of time during pre-trial hearings or the trial.

### 4. Fox Will Not Be Inconvenienced By Litigating In Georgia.

Fox proclaims that it is the number one-rated news network in the United States. Def.'s Memo. at 4. As a national cable news network, Fox is constantly engaged in newsgathering all over the United States and the world. Fox argues that it will somehow be inconvenienced by having at most, 8 of its employees possibly travel to Atlanta for a trial of this case – an argument that flies in the face of the fact that Fox is a mammoth news organization whose existence depends on being able to have its personnel travel to all parts of the nation and world on short notice in order to produce news coverage. Indeed, Fox employees have a history of traveling to Georgia and conducting substantial reporting on the Ramsey case here. See Decl. of Wood at ¶11. McKinley has traveled to Atlanta at least

2 times in order to investigate the murder of JonBenét Ramsey and to either interview the Ramseys or solicit an interview from them. Id.

Fox also ignores the critical distinction between party and non-party witnesses. In analyzing the convenience of witnesses, the case law distinguishes between party witnesses (i.e., parties and those closely aligned with a party) and non-party witnesses. State Street Capital Corp., 855 F. Supp. 192, 197 (S.D. Tex. 1994); Aquatic Amusement Assocs., Ltd. V. Walt Disney World Co., 734 F. Supp. 54, 57 (N.D.N.Y. 1990). In this regard, the law acknowledges that party witnesses are presumed to be willing to testify in either forum despite the inconvenience while non-parties do not receive such a presumption. Gundle Lining Const. Corp. v. Fireman's Fund Ins. Co., 844 F. Supp. 1163, 1166 (S.D. Tex. 1994). Under such analysis, the convenience of non-party witnesses is accorded greater weight in a transfer of venue analysis. State Street Capital Corp., 855 F. Supp. at 197 ("it is the convenience of non-party witnesses, rather than that of party witnesses, that is the more important factor and is accorded greater weight in a transfer of venue analysis"); Aquatic Amusement Assocs., Ltd., 734 F. Supp. at 57 ("[w]hile the convenience of party witnesses is a factor to be

considered, the convenience of non-party witnesses is a more important factor.").

Further, given the obvious financial disparity between the parties, Fox is in a much better financial position than are plaintiffs to have its employees make short visits here to testify in a defamation case that arises out of Fox's conscience decision to broadcast the Ramsey segment in the pursuit of profit. Unlike Fox employees, plaintiffs will have to be present in Georgia for the entire trial.

Fox further asserts that its need to provide news coverage of other newsworthy events, such as the upcoming trial of Kobe Bryant, necessitate that this case be transferred to Colorado. See Decl. of King at ¶ 16. As a newsgathering entity, Fox is always aware that newsworthy events can occur at any time in any place, necessitating travel and work by many of its employees. A contention by Fox that it cannot adequately cover other new events in Colorado or elsewhere because some of its employees will have to appear for a short period of time in Georgia to testify at a civil trial is simply not substantiated or credible.

## 5.  Convenience of Non-Party Witnesses

Without support, Fox alleges that the bulk of documentary evidence is located in Colorado in the possession of third party

witnesses. Fox's failure to adequately identify such documents renders this argument moot. State Street Capital Corp., 855 F. Supp. at 198 (defendant's failure to identify documents located in desired forum comports with plaintiff's claim that venue should remain in chosen forum). Further, modern methods of transportation and transmittal have significantly diminished the weight that the location of evidence previously held. Aeroquip Corp, 887 F. Supp. at 295 ("...the Court acknowledges the relative ease with which major corporations can transport information, materials and witnesses several thousand miles." citing Pidcock v. Sunnyland American, Inc., 1987 WL 348873 *2 (S.D.Ga. 1987) ("[b]ecause usually many records or copies thereof, are easily transported, their location is not entitled to great weight.").[2]

To the extent document production in Colorado is a burden, it will fall more heavily on plaintiffs than Fox because counsel for Fox, unlike counsel for plaintiffs, maintains law offices in Boulder, Colorado, Colorado Springs, Colorado and Denver, Colorado. See http://www.hhlaw.com/site/home.asp. Fox should have no problem obtaining documents in Colorado for transport to Georgia, or if necessary, to litigate in Colorado any legal

---

[2] A considerable number of documents responsive to Fox's anticipated discovery requests are maintained in Atlanta at the law offices of plaintiffs' counsel. Decl. of Wood at ¶ 8.

issues that might arise from production requests directed to third parties in that state.

Fox also contends that transferring this case to Colorado will prevent inconvenience to a laundry list of potential witnesses because the principle witnesses concerning the investigation into JonBenét's death are located in Colorado. Defendant's Memo. at 9-12. The exclusive evidence used by Fox to support this contention is the declaration of McKinley and the declaration of Denis King ("King"), the Colorado Bureau Chief for Fox.

Fox asserts that each of the listed witnesses in the McKinley and King declarations has personal knowledge of matters at issue in this lawsuit, but fails to offer any declarations or evidence from any of the witnesses it claims will be inconvenienced other than McKinley and King. Fox has instead relied exclusively on the hearsay statements of McKinley to describe the asserted personal knowledge of various law enforcement figures associated with the murder investigation.

Even if Fox is seriously considering calling all of these non-party witnesses to trial, the nature of the witnesses' testimony renders consideration of the number of witnesses alone to be insignificant to the Court's analysis on venue issues. The materiality of the prospective witnesses' testimony, and not

merely the number of prospective Colorado witnesses Fox suggests
it can call, determines the extent to which their convenience
will be weighed. Scheidt v. Klein, 956 F.2d 963, 966 (10th Cir.
1992) (district court must receive "some factual information
relative to the materiality of witness testimony and [other
relevant] considerations.").

> To meet the burden of demonstrating that transfer is
> in the convenience of the witnesses, the party seeking
> to transfer must specifically list the evidence and
> witnesses on which the party intends to rely in the
> transferee district, along with a general statement of
> the topics of each witnesses testimony. . . . Absent
> such a showing, the motion should be denied.

Pilates, Inc. v. Pilates Institute, Inc., 891 F. Supp. 175, 183
(S.D.N.Y. 1995). Even if the hearsay statements of McKinley and
King about the personal knowledge of these witnesses could
somehow be deemed to satisfy the threshold elements of the
requisite showing, it cannot be assumed that Fox's list of
witnesses who can allegedly testify about the Ramsey segment and
preparation of the Ramsey segment renders material the testimony
of all of these witnesses. Under the narrow and well-defined
allegations of plaintiffs' amended complaint, it is not at all
clear that the testimony of all of these potential witnesses
would be necessary or material. It is more likely that the
testimony of many of the named individuals would be cumulative
and irrelevant to the real questions presented. See State Street

Capital Corp, 855 F. Supp. At 198 ("...it is not the number of witnesses but the importance of the witnesses that is determinative.")

Plaintiffs concede that both parties will need to rely on some non-party witnesses from Colorado and other states on the issue of falsity of the Ramsey segment statements that Burke was a suspect and that no evidence existed linking an intruder to the murder. However, pure defamation issues of negligence and actual malice will be determined almost exclusively by reliance on Fox party witnesses: i.e., what did Fox know and when did it know it as well as inquiry about the details of the Fox investigation and reporting.

While it is true that certain non-party witnesses from Colorado and other states may suffer some measure of inconvenience if they agree to testify live in Georgia, Fox neglects to point out that if the case is transferred to Colorado, a number of Georgia witnesses will likewise suffer some measure of inconvenience if they agree to testify live in Colorado. Fox has failed to offer this Court any probative evidence that any material, non-party witnesses from Colorado will be more inconvenienced by traveling to Georgia than will be any material, non-party witnesses from Georgia having to travel to Colorado. Plaintiffs will be required to call not only

- 17 -

witnesses on the issue of libel but also witnesses who can testify about the harm suffered to plaintiffs' reputation. *See* Decl. of Wood at ¶ 6. Plaintiffs resided in the Northern District for years before they were defamed by the Fox segment and for nine months after the broadcast. Accordingly, it is Georgia witnesses who can best testify as to the reputational harm suffered by plaintiffs.

Fox has simply failed to make the necessary showing that transfer will enhance the convenience of any witnesses in this case.[3] "[V]ague statements about the convenience of unknown and unnamed witnesses is insufficient to convince this Court that the convenience of the witnesses and the parties would be best served by transferring venue." Smith v. Colonial Penn. Ins. Co., 943 F.Supp. 782, 784 (S.D. Tex. 1986); J.I. Kislak Mtg. Corp. v. Connecticut Bank and Trust Co., 604 F. Supp. 346, 348 (S.D. Fla. 1985) (denying transfer motion where defendant did not establish by clear showing that other forum was more convenient); Robinson, 74 F.3d at 253. (stating that shifting of inconvenience from defendant to plaintiff did not justify transfer). Without offering proof to support its contention that most witnesses and documents are

---

[3] Fox cites a jury viewing of the murder scene in Boulder as another significant venue factor, but fails to note that the appearance of the Ramsey house has been dramatically changed since the December 1996 murder. Decl. of Wood at ¶ 12.

located in Colorado, Fox has done little more than offer conclusory assertions as to the merits of its motion. Because the witnesses and evidence that are necessary to the adjudication of this matter are dispersed throughout Georgia and Colorado, Fox cannot carry its burden of showing clearly that the balance of conveniences for witnesses is "strongly in favor" of a transfer to Colorado.

### 6.   **Interests of Justice**

The interests of justice are not served by a transfer of this case to Colorado. Here, the interests of justice are better served by allowing this action to proceed in plaintiff's chosen venue because (1) Georgia has a substantial interest in adjudicating this controversy; (2) Georgia substantive law must be applied to this case and this Court has a greater familiarity with that law; and (3) there are legitimate concerns that the massive coverage of this case in Colorado in the early years of the investigation was so prevalent and insidious that plaintiffs might not receive a fair trial in Colorado.

Fox argues that the interests of justice are best served by transferring this case to Colorado because First Amendment considerations weigh in favor of transfer. Fox's argument fails because First Amendment considerations with respect to questions of venue, like jurisdiction, are not an appropriate part of the court's inquiry. In Calder v. Jones, 465 U.S. 783 (1984), the

- 19 -

Supreme Court categorically rejected the First Amendment position
urged by Fox in its motion:

> We also reject the suggestion that First Amendment
> concerns enter into the jurisdictional analysis. The
> infusion of such considerations would needlessly
> complicate an already imprecise inquiry. Moreover, the
> potential chill on protected First Amendment activity
> stemming from libel and defamation actions is already
> taken into account in the constitutional limitations
> on the substantive law governing such suits. To
> reintroduce those concerns at the jurisdictional stage
> would be a form of double counting. We have already
> declined in other contexts to grant special procedural
> protections to defendants in libel and defamation
> actions in addition to the constitutional protections
> embodied in the substantive laws.

Calder v. Jones, 465 U.S. at 790; accord Keeton v. Hustler, 465
U.S. at 770, 780 n.12. (1984).

Properly analyzed, consideration of the interests of
justice should focus on the fact that Georgia has a compelling
interest in adjudicating this action because of its interest in
protecting its citizens from harm caused by defamatory telecasts
purposefully published and broadcast within this state. "False
statements of fact harm both the subject of the falsehood and
the readers of the statement. [Georgia] may rightfully employ
its libel laws to discourage the deception of its citizens.
There is 'no constitutional value in false statements of fact.'"
Keeton, 465 U.S. at 776 (quoting Gertz v. Robert Welch, Inc.,
418 U.S. 323, 340 (1974)).

Moreover, federal courts favor adjudication of diversity actions by the court that sits in the state whose substantive law will govern the case. e.g., FUL Inc. v. Unified School Dist. No. 204, 839 F. Supp. 1307, 1313 (N.D. Ill. 1993) (fact that transferor state law governed action weighed against transfer). As previously indicated, Georgia follows the "lex loci delicti" choice of law rule for tort actions and, therefore, would apply Georgia substantive law in this case. Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc., 133 F.3d 1405, 1409 (11th Cir. 1998). Even if the case is transferred to Colorado, Georgia law must still be applied since in multistate tort suits, "...Colorado has adopted the general rule of applying the law of the state having the most "significant relationship" with the occurrence and the parties as contained in the Restatement (Second) Conflict of Laws (1971)." Ranger v. Fortune Insurance Co., 881 P.2d 394,395 (Co. Ct. App. 1994), reh'g denied 1994, cert. denied 1994 citing First National Bank v. Rostek, 182 Colo. 437, 514 P.2d 314 (1973). Restatement (Second) of Conflict of Laws § 150 addresses multistate defamation and "declares that rights and liabilities from defamatory material are determined by the local law of the state which has the most significant relationship to the occurrence, and subsection (2) declares that a significant relationship exists in the state where the party was domiciled

at the time that the matter complained of was published in that
state." Anselmi v. Denver Post, Inc., 552 F.2d 316, 321 (10th
Cir. 1977).

Finally, in analyzing the interest of justice, consideration
must be given to whether plaintiffs would be able to obtain a fair
trial in Fox's desired venue. Haworth, Inc. v. Herman Miller, Inc.,
821 F.Supp. 1476, 1480 (N.D. Ga. 1992). In cases where there is a
potential for jury bias, the fundamental fairness of trial must be
upheld. Coleman v. Kemp, 778 F.2d 1487, 1489 (11th Cir. 1985).
Prejudice is presumed in cases where pretrial publicity is so
pervasive and inflammatory as to saturate the community where the
trial is to be held. Rideau v. State of Louisiana, 373 U.S. 723,
726-27, 83 S. Ct. at 1419-20 (1963). Adverse pretrial publicity can
create such a presumption of prejudice that jurors claims that they
will be able to be impartial should not be believed. Nevers v.
Killinger, 990 F. Supp. 844,854 (E.D. Mich. 1997).

Inflammatory and prejudicial publicity regarding the murder of
JonBenét Ramsey saturated Colorado continuously for years following
the 1996 murder. A search of the archives of the major newspapers
in Colorado contains thousands of print articles about the JonBenét
Ramsey case, but not all of the print articles that were published

between 1996 and 2004.[4] While there is no archive for the massive television and radio coverage of the case in Colorado, its existence can be fairly assumed from the extent of the print coverage and the high profile nature of the case.

Unfortunately, much of the Colorado publicity surrounding JonBenét's murder was biased against plaintiffs and was often based on false, distorted or incomplete facts. The best example of the prejudicial publicity against plaintiffs was when the Governor of Colorado, Bill Owens, spoke out publicly about the case in an October 1999 press conference. Governor Owens demanded that plaintiffs "[q]uit hiding behind [their] attorneys, quit hiding behind [their] public relations firm; come back to Colorado and work with us to find the killers in this case, no matter where that trail may lead." *See* Exhibit "A" attached hereto. ("Owens Challenges Ramseys," *Denver Post*, October 28, 1999). In the same press conference, Governor Owens made numerous inflammatory statements about plaintiffs which insinuated that they were likely guilty of the crime of murder. Id. At one point during his statement, Governor Owens went as far as stating "...based on the

---

[4] *See*, http://web.dailycamera.com/extra/ramsey/index.html (*Boulder Daily Camera* Archives); http://www.denverpost.com/Stories/ 0,1413,36%257E56%257E,00.html (*Denver Post* Archives); http://www.longmontfyi.com/ramsey/ (*Longmont Daily Times Call* Archives); http://www.denver.rockymountainnews.com/extra/ ramsey2.html (*Rocky Mountain News* Archives)

evidence available to me, they (the police) are now targeting the right suspects." Id. In a survey, three out of four Coloradoans believed that Governor Owens' comments regarding the Ramseys were appropriate. See Exhibit "B" attached hereto ("Poll: Most back Owens," Denver Post.com, October 29, 1999).

Despite the fact that plaintiffs have clearly been vindicated by recent public statements by knowledgeable public officials (see Amend. Compl. at ¶¶ 38, 51, 52), there remain legitimate concerns as to whether plaintiffs could effectively mitigate the prejudice of the massive negative coverage in Colorado during the early years of the murder investigation. Plaintiffs should not have this additional burden imposed on them in a defamation case by a transfer of this case to Colorado.

### III. CONCLUSION

Georgia is the forum of plaintiffs' choice. The cause of action for defamation arose in Georgia. Plaintiffs lived in Georgia at the time of the defamatory broadcast and suffered the greatest damage to their reputations in Georgia. Georgia substantive law applies to this diversity action. Fox is a wealthy corporation and capable of financing litigation in a distant jurisdiction. Fox has failed to make any lawful showing that any inconvenience to it or its proposed Colorado witnesses resulting from venue in this Court significantly outweighs the

inconvenience that would be imposed on plaintiffs and their proposed Georgia witnesses if the case is transferred to Colorado. Georgia has an interest in protecting its citizens and Georgia law applies to this case. The JonBenét Ramsey case has not received the massive news coverage in Georgia that it has received in Colorado for many years. For these reasons, Fox's motion to transfer should be denied.

**L. LIN WOOD, P.C.**

L. Lin Wood
Ga. State Bar No. 774588

Katherine M. Ventulett
Ga. State Bar No. 727027

Suite 2140
The Equitable Building
100 Peachtree Street, NW
Atlanta, Georgia 30303
404/522-1713                    Attorneys for Plaintiffs



**DPO**
DenverPost.com·
◆ FRONT PAGE
SITE INDEX
SEARCH

◆ BACK TO JONBENET

◆ BACK TO NEWS

RELATED
▼
- Main story
- What it means
- Mistakes doubted
- Owens text
- Ramsey text
- Chuck Green column
- Post editorial

# Owens challenges Ramseys

**By Karen Auge**
**Denver Post Staff Writer**

**Oct. 28** - He didn't appoint a special prosecutor to take over the JonBenet Ramsey investigation, but Gov. Bill Owens did point accusatory fingers - squarely in the direction of the girl's parents, John and Patsy Ramsey.

Speaking to reporters Wednesday, Owens revealed he believes more than one person was involved in the crime and said new evidence uncovered outside the 13-month grand jury investigation is being analyzed.

He also issued a challenge to John and Patsy Ramsey:

"Quit hiding behind your attorneys, quit hiding behind your public relations firm; come back to Colorado and work with us to find the killers in this case, no matter where that trail may lead," Owens said.

And Mike Kane, the veteran prosecutor who led the grand jury, said he's confident the trail has not grown cold and the case eventually will be solved.

The governor chastised the Ramseys for not being more cooperative with the investigation. Months after their 6-year-old daughter's beaten, strangled body was found in the basement of their home, the Ramseys moved from Boulder to the Atlanta area.

"While in our system they are innocent until proven guilty, as a parent, as a father of a youngster who is the same age as JonBeneÜt, I think that they could have and should have been more helpful than they have been," Owens said.

The Ramseys, who haven't spoken publicly about the case for more than a year, fired back at Owens.

"Mr. Owens' slanderous remarks pander to the fringe lynch mob which long ago cast aside the timehonored presumption of innocence," the Ramseys said in a statement released by their attorneys. "Coming from a public official elected to the highest office of this state, his comments are unconscionable."

Owens' remarks came at a news conference where, as expected, he officially announced he would not seek a special prosecutor in the nearly 3-year-old murder case. But his comments, seemingly implicating the Ramseys, were unexpected.



EXHIBIT "A"

John and Patsy Ramsey talked with police the day their daughter's body was found on Dec. 26, 1996, but after that were reluctant to be questioned. In June 1998, both parents, and their son, Burke, came to Colorado and were questioned by Boulder police and prosecutors over two days.

Asked later if he meant to imply that he believes the Ramseys killed their daughter, Owens' response was "no comment."

But Owens did become the first official connected to the case to state publicly that more than one person could be a suspect. "There is reason to believe there is more than one person involved," he said.

According to the statement, Owens ignored an offer to meet with the Ramseys and refused to consult with detectives outside the Boulder Police Department who worked on the case. The Ramseys hired a private detective to investigate their daughter's death, and Lou Smit, a well-respected, retired Colorado Springs detective brought into the investigation by the Boulder DA's office, has said he believes the Ramseys didn't kill their daughter.

Owens assembled a team of seven legal experts to help him decide if a special prosecutor could advance the 34-month-old investigation. The team met with Boulder District Attorney Alex Hunter and his advisers, Boulder police and Colorado Bureau of Investigation officials over the past two weeks. In announcing his decision, Owens acknowledged that investigators made mistakes early, and said those blunders could make it difficult to win a conviction in the case. But the investigation was "reformed, and yes, even redeemed" last summer when Hunter brought in three seasoned prosecutors to lead the grand jury investigation, Owens said.

That grand jury investigation lasted 13 months and finished Oct. 13 with no indictment.

Owens also revealed in his remarks that new evidence recently had been uncovered outside the grand jury investigation.

And echoing Boulder Police Chief Mark Beckner and Hunter, the governor said the investigation is moving ahead. Appointing a state prosecutor now would hinder more than help the case, he said.

"The right people are now working on the Ramsey case, and they are working together as a team. And based on the evidence available to me, they are now targeting the right murder suspects," he said.

Owens also revealed "substantial new evidence is being analyzed and will continue to be analyzed."

Investigators declined to reveal what that evidence might be; however,

Beckner said last week that Boulder police are consulting with famed criminologist Dr. Henry Lee.

Hunter said in a prepared statement that Owens had told him of the decision Wednesday before the public announcement. Hunter said he "appreciated the thoroughness" of Owens' review, and again emphasized that the investigation is continuing.

"Everything is in place in Boulder to continue this investigation. We have a dedicated team of detectives; Mike Kane remains under contract with my office, providing advice and legal counsel; and my prosecution task force will continue to advise me," Hunter said. "I remain confident that we have the very best team in place as we continue our work."

Beckner said he was impressed with Owens' thorough consideration of the matter. "I think he made the right decision. Obviously we agree with it," Beckner said.

And he said he appreciated the governor's comments that the right people are now on the case. But he declined to comment on Owens' remarks that implied the Ramseys are suspects.

"I can't address that," Beckner said. "The governor can speak for himself. He certainly can draw his own conclusions."

Former Boulder Detective Steve Thomas, who resigned in disgust last year and accused Hunter's office of crippling the investigation, said Wednesday he respects Owens' decision.

"But at the same time I can sense his frustration in the difficulty of probable cause vs. proving beyond a reasonable doubt," Thomas said. "But I was also encouraged by his commitment in seeing the killer brought to justice."

While friction between Boulder's prosecutors and police early in the investigation became widely known, Owens said that is no longer a problem.

"I'm convinced the police and district attorney's office are working well together," he said.

Hunter's spokeswoman, Suzanne Laurion, said the DA's office agrees. Relations between the two departments got better as soon as Beckner - then a Boulder police commander in charge of the detective division - took over the police investigation.

Since then, "it has done nothing but get better," she said.

*Staff writer Marilyn Robinson contributed to this report.*

Copyright 1999 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

Return to Top
Return to JonBenet
Return to News
Return to Post Home

Case 1:03-cv-03976-TWT    Document 19    Filed 03/29/04    Page 30 of 33



← FRONT PAGE
SITE INDEX
SEARCH

← BACK TO JONBENET

← BACK TO NEWS

RELATED

- Owens challenges Ramseys
- What it means
- Mistakes doubted
- Owens text
- Ramsey text
- Chuck Green column
- Post editorial
- Owens called a liar
- Poll on Owens

Return to Top
Return to JonBenet
Return to News
Return to Post Home

# Poll: Most back Owens

## By **The Denver Post**

**Oct. 29** - Three out of four Coloradans say Gov. Bill Owens' comments about John and Patsy Ramsey were appropriate, according to Thursday's KUSA 9News poll conducted by SurveyUSA.

Seventy-six percent of those polled say Owens' comments that the Ramseys should "stop hiding behind their attorneys" and come back to Colorado to hunt for JonBenet's killers were appropriate.

Twenty percent thought they were inappropriate, and 4 percent were unsure.

The group surveyed 500 adults in Colorado.

Copyright 1999 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.



## CERTIFICATION OF COUNSEL

Pursuant to N.D. Ga. Local Rule 7.1 D, I hereby certify that this document is submitted in Courier New 12 point type as required by N.D. Ga. Local Rule 5.1(b).


L. LIN WOOD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

JOHN BENNETT RAMSEY and          )
PATRICIA PAUGH RAMSEY,           )
                                 )
    Plaintiffs,                  )          CIVIL ACTION FILE
                                 )
vs.                              )          NO. 1 03 CV-3976 (TWT)
                                 )
FOX NEWS NETWORK, L.L.C.,        )
                                 )
    Defendant.                   )
                                 )

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the within and foregoing PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO TRANSFER VENUE PURSUANT TO 28 U.S.C. § 1404(a) upon Defendant's counsel and depositing same in the United States Mail, postage prepaid and addressed to:

        Mr. Judson Graves
        Alston & Bird, LLP
        One Atlantic Center
        1201 W. Peachtree Street
        Atlanta, Georgia 30309-3424

        Mr. Slade R. Metcalf
        Ms. Dori Ann Hanswirth
        Mr. Jason P. Conti
        Ms. Trina R. Hunn
        Hogan & Hartson, L.L.P.
        875 Third Avenue
        New York, NY 10022

This ____29th____ day of March, 2004.

                                        **L. LIN WOOD, P.C.**

                                        _____
                                        L. Lin Wood
Suite 2140                              Ga. State Bar No. 774588
The Equitable Building
100 Peachtree Street, NW
Atlanta, Georgia 30303
404/522-1713
404/522-1716 Fax                        Attorneys for Plaintiffs

- 2 -