

ORIGINAL

FILED IN CLERK'S OFFICE

JUN 8 2004

LUTHER... ...rk
By: _____ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JOHN RAMSEY, PATSY RAMSEY, and )
BURKE RAMSEY, a minor, by his )
next friends and natural parents,)
JOHN RAMSEY and PATSY RAMSEY, )
                                 )
    Plaintiffs,                  )    CIVIL ACTION FILE
                                 )
vs.                              )    NO. 1 03 CV-3976 (TWT)
                                 )
FOX NEWS NETWORK, L.L.C., d/b/a  )
Fox News Channel                 )
                                 )
    Defendant.                   )

## PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS

### I. Introduction

This is a diversity action for defamation by broadcast or "defamacast." The case arises out of a December 27, 2002 television news report broadcast by defendant in connection with the sixth (6th) anniversary of the notorious murder of JonBenét Ramsey, the daughter of plaintiffs John and Patsy Ramsey and the sister of plaintiff Burke Ramsey ("Burke").

On December 23, 2003 plaintiffs filed this defamation action against defendant, Fox News Network, L.L.C. On February 17, 2004, plaintiffs filed a First Amended Complaint for Defamation ("First Amend. Compl."). On April 28, 2004, defendant filed a motion to dismiss the complaint under Federal Rule of

Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

The thrust of defendant's motion is that statements in the television news report "cannot possibly be construed as defamatory of any of the [p]laintiffs in this case." Def.'s Memo. at 4. Defendant also contends that if the television news report is deemed defamatory, it is defamatory per quod, not per se, and the complaint should be dismissed because plaintiffs failed to plead special damages. Def.'s Memo. at 23.

Plaintiffs assert that the television news report is, or can be reasonably construed by a jury to be, defamatory per se because the report directly or by implication conveys to viewers: (a) that Burke had at some point in the past been considered a police suspect in connection with his sister's murder; (b) that detectives had good reason to suspect plaintiffs were involved in the murder; and (c) that one or more of the plaintiffs was likely involved in the murder since they were the only people known to have been in the family home for a long time that night and despite six years of investigation, there had never been any evidence to link an intruder to the murder.

For the reasons set forth below, plaintiffs submit that defendant's motion to dismiss must be denied as the statements

at issue are defamatory per se or, at a minimum, are ambiguous and require that the question of defamatory meaning be submitted to a jury.

## II. Factual Background

When considering a Rule 12(b)(6) motion, a court must construe the complaint in the light most favorable to plaintiff and accept each of the plaintiff's allegations of material fact as true. Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983). Therefore, the relevant facts as alleged by plaintiffs in their complaint are as follows:

### A.   The murder and its investigation.

On the night of December 25, 1996 or during the early morning hours of December 26, 1996, while plaintiffs were sleeping in their former home in Boulder, Colorado, an unknown assailant brutally assaulted and murdered JonBenét Ramsey. First Amend. Compl. ¶ 18.

Since the date of her death, the murder of JonBenét Ramsey has been investigated by law enforcement officials in the State of Colorado, including detectives and other members of the City of Boulder Police Department and the Boulder County District Attorney's Office. First Amend. Compl. ¶ 20. As noted by this Court in Hoffman-Pugh v. Ramsey, 193 F. Supp. 2d 1295, 1297

(N.D.GA. 2002) aff'd 312 F. 3d. 1222 (11th Cir. 2002), the
JonBenét Ramsey murder "has been the subject of intense media
attention, books, novels, film and television. No one has been
charged, indicted or arrested in connection with the crime. The
case remains unsolved and the investigation open." See First
Amend. Compl. ¶¶ 21, 23.

Plaintiffs were not involved in the murder of JonBenét.
First Amend. Compl. ¶¶ 25-27.

### B.    Plaintiffs' status in the murder investigation.

Boulder police detectives and the district attorney's
detectives have never considered Burke to be a suspect in the
investigation of the murder of his sister. First Amend. Compl. ¶
36. Burke has never been "cleared" by law enforcement
authorities because he has never been investigated as a suspect
or a possible suspect. First Amend. Compl. ¶ 39.

While John and Patsy Ramsey were at some point in the past
described by the Chief of the Boulder Police Department as being
"under the umbrella of suspicion" with respect to the
investigation of the murder, they have consistently asserted
that no incriminating evidence or good reason has ever existed
that justified police suspicion that they or their son were
involved in JonBenét's murder. First Amend. Compl. ¶¶ 25-27, 29,
37, 41.

## C.    The evidence that links an intruder to the murder.

Substantial evidence gathered by law enforcement officers in the investigation of JonBenét's death links an intruder to her brutal murder, including: DNA evidence; stun gun marks; evidence of exit and entry through a basement window or kitchen door; hair and fiber evidence; shoe print evidence; autopsy evidence concerning the manner and timing of her death; evidence of the use of a rope to torture her; materials used in the murder that were not owned by plaintiffs or found in their home; a ransom note not identified as being authored by plaintiffs; and a complete absence of evidence of motive or history indicating that plaintiffs were capable of murder or staging an elaborate cover up of the crime. First Amend. Compl. ¶ 41.

Evidence that linked an intruder to the murder of JonBenét had been the subject of print and broadcast media coverage prior to December 27, 2002 and was also a matter of public record prior to that date in the civil matter captioned *Robert Christian Wolf v. John Bennett Ramsey and Patricia Paugh Ramsey*, Civil Action file No. 00-CIV-1187 (JEC) in the United States District Court for the Northern District of Georgia, Atlanta Division. First Amend. Compl. ¶¶ 47, 50. In that case, on March 31, 2003, Judge Julie E. Carnes of the United States District Court for the Northern District of Georgia entered an order

granting summary judgment, stating in pertinent part, "the weight of the evidence is more consistent with a theory that an intruder murdered JonBenét than it is with a theory that Mrs. Ramsey did so." First Amend. Compl. ¶ 51.

On April 7, 2003, Boulder District Attorney Mary T. Keenan issued a statement in which she concurred with Judge Carnes' opinion, stating in pertinent part, "I agree with the Court's conclusion that 'the weight of the evidence is more consistent with a theory that an intruder murdered JonBenét than it is with a theory that Mrs. Ramsey did so.'" First Amend. Compl. ¶ 52.

The evidence that linked an intruder to the brutal murder of JonBenét was well known to defendant prior to the broadcast of the television news report. First Amend. Compl. ¶¶ 46-53.

**D.    The December 27, 2002 television news report.**

Plaintiffs attached a complete written transcript of the news report as Exhibit "A" to the amended complaint. First Amend. Compl. ¶ 28. Prior to the filing of this complaint, defendant refused plaintiffs' request for a video copy of the entire broadcast at issue. June 8, 2004 Declaration of L. Lin Wood at ¶ 4. Defendant has failed to submit a video tape of the television news report for review and consideration by the Court in connection with its motion to dismiss.

The report published the following statements, along with audio, video and photographs not before the Court:

**INTRO:** THE MYSTERY OF WHO KILLED JONBENET RAMSEY HAS BEEN UNSOLVED FOR AS LONG AS HER SHORT LIFE. SHE WAS SIX AND A HALF YEARS OLD WHEN SHE WAS MURDERED DECEMBER 26^(TH), 1996. FOX'S CAROL MCKINLEY REPORTS.

**MCKINLEY:** AFTER ALL THIS TIME, THE ONLY ACTION SEEN IN THE UNSOLVED CASE HAS BEEN IN CIVIL COURT. MILLIONS OF DOLLARS HAVE CHANGED HANDS...MUCH OF IT HAS COME FROM PEOPLE WHO CALLED JONBENET'S OLDER BROTHER BURKE, WHO'S BEEN CLEARED, A SUSPECT...THE RAMSEYS HAVE SUCCESSFULLY SUED TABLOID AND MAINSTREAM MEDIA FOR DEFAMATION. FORMER EMPLOYEES HAVE SUED THE RAMSEYS FOR THE SAME REASON. BUT STILL NO ONE STANDS RESPONSIBLE FOR THE SIX YEAR OLD MURDER OF THE LITTLE BEAUTY PRINCESS.

**DR. HENRY LEE (tape):** We need some good evidence. physical evidence. Which this case has very few pieces of evidence.

**MCKINLEY:** The crime scene was contaminated from the start. People were allowed to move evidence and walk about the house...but it [sic] soon became clear who the authorities suspected.

**FORMER BOULDER POLICE DETECTIVE STEVE THOMAS (tape):** The district attorney and his top prosecutor, two police chiefs and a large number of cops although so at odds that they almost came to blows all agreed on one thing: that [sic] probable [sic] cause existed to arrest Patsy Ramsey in connection with the death of her daughter.

**MCKINLEY: DETECTIVES SAY THEY HAD GOOD REASON TO SUSPECT THE RAMSEYS. THE COUPLE AND JONBENET'S NINE YEAR OLD BROTHER, BURKE, WERE THE ONLY KNOWN PEOPLE IN THE HOUSE THE NIGHT SHE WAS KILLED.** JONBENET HAD BEEN BLUDGEONED AND SEXUALLY ASSAULTED, MOST LIKELY FROM ONE OF HER MOTHER'S PAINTBRUSHES. THE LONGEST RANSOM NOTE MOST EXPERTS HAVE EVER SEEN...THREE PAGES...WAS LEFT BEHIND...**WHOMEVER KILLED HER SPENT A LONG TIME IN**

**THE FAMILY HOME, YET THERE HAS NEVER BEEN ANY EVIDENCE TO LINK AN INTRUDER TO HER BRUTAL MURDER.**

**JOHN RAMSEY (tape):** I mean the fact that we were the prime suspects on December 26th. We had that ranking.

**MCKINLEY: BUT THAT MAY CHANGE.** IN A RECENT MAJOR DEVELOPMENT, THE BOULDER POLICE, LONG SUSPICIOUS OF THE RAMSEYS, HAS TURNED THE CASE OVER TO DISTRICT ATTORNEY MARY KEENAN, TO BRING "FRESH EYES" TO THE INVESTIGATION.

**LIN WOOD (tape):** This is a new day in this investigation. The days of the Ramseys being the focus of the investigation...those days are over.

**MCKINLEY:** CRITICS SAY KEENAN TOOK OVER THE DORMANT CASE TO AVOID A LAWSUIT BY RAMSEY ATTORNEY LIN WOOD...BUT IN A LETTER SHE WROTE TO WOOD, SHE SAYS: "Please understand that this decision is being made for one reason only. The fact that a violent child murderer is at large."

**LIN WOOD (tape):** This is about a legitimate desire on her part to find a violent child killer. Not to avoid a lawsuit. Not to engage in a bunch of rhetoric.

**MCKINLEY: KEENAN PROMISES TO INVESTIGATE NEW LEADS AND POTENTIAL SUSPECTS IN THE CASE. WHETHER FRESH EYES BRINGS FRESH ANSWERS REMAINS TO BE SEEN.**

IN BOULDER, COLORADO CAROL MCKINLEY FOX NEWS.

[Emphasis supplied].

### III. Motion to Dismiss Standard in a Defamation Action

It is well-established that "a complaint should not be dismissed pursuant to F.R.C.P. 12(b)(6) unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355

U.S. 41, 45-46, 78 S. Ct. 99 (1957); Linder v. Portocarrero, 963 F.2d 332 (11th Cir. 1992). Defendant bears the "very high burden of showing that [plaintiffs] cannot conceivably prove any set of facts that would entitle [them] to relief." Beck v. Deloitte & Touche, 144 F.3d 732, 736 (11th Cir. 1998) citing Jackam v. Hosp. Corp. of Am. Mideast, Ltd., 800 F.2d 1577, 1579 (11th Cir. 1986). "Generally, notice pleading is all that is required for a valid complaint ... and plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests." Hoffman-Pugh v. Ramsey, 193 F. Supp. at 1298 (citations omitted).

As a general rule, the question of whether published statements are defamatory is a jury question. Mead v. True Citizen, 203 Ga. App. 361, 362 (1992). The question is only one of law for the court where the statements are not ambiguous and can reasonably have but one interpretation. Id. After reviewing and construing the television news report as a whole, the court "may find that it is not defamatory, that it is defamatory, or that it is ambiguous and the question is one for a jury." Id. In Hoffman-Pugh v. Ramsey, this Court succinctly enunciated the role of judge and jury applicable to this action for defamacast:

> A [television broadcast] claimed to be defamatory must
> be [viewed] and construed in the sense in which the
> [viewers] to whom it is addressed would ordinarily

understand it. So the whole item ... should be [viewed] and construed together, and its meaning and signification thus determined. When thus [viewed], if its meaning is so unambiguous as to reasonably bear but one interpretation, it is for the judge to say whether that signification is defamatory or not. If upon the other hand, it is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its [broadcast], including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read. Ledger-Enquirer Co. v. Brown, 214 Ga. 422, 424, 105 S.E.2d 229 (1958) (quoting Commercial Publishing Co. v. Smith, 149 F. 704, 706 (6th Cir.1907)).

Hoffman-Pugh v. Ramsey, 193 F. Supp. at 1299.

### IV. Argument

**A.    Defendant has not provided the Court with the video of the television news report in order for the Court to be able to view in context the broadcast as a whole.**

Plaintiffs agree with defendant that the question for the Court is what construction the average viewer would place upon the telecast. Def.'s Memo. at 13. Plaintiffs likewise agree that in determining whether the statements in a broadcast are capable of a defamatory meaning, the Court must consider the statements in the context of the broadcast as a whole. Def.'s Memo. at 12. Significantly, plaintiffs also agree with defendant that the court must consider the telecast, the pictures and spoken narrative taken in their entire context. Def.'s Memo. at 12. Here, it is impossible for defendant to carry its burden on its

motion to dismiss since defendant has not provided the Court with a video of the news report for review to determine the impression and construction the broadcast would have on the average viewer.

Defendant is attempting to have this Court reach a determination about the impact of a 2 minute, 23 second television broadcast (see T.R.T. on page 3 of Exhibit "A" to First Amended Compl.) on an average viewer by reviewing only a written script of the broadcast. This tactic puts the Court in the position of only being able to consider at best the impact of the script on the average reader. The average viewer of the broadcast, unlike the average reader of the script, does not have the opportunity to carefully review and study the video and spoken narrative to determine its impact as a whole. A television broadcast is more than spoken words – its words must be viewed in context of the intonation of the speaker and the photos and video that are displayed as an integral part of the broadcast. Words that may appear innocent when carefully and repeatedly studied and parsed on paper may have a significantly different impact when viewed and heard on television as part of an approximate 2 1/2 minute broadcast that contains only spoken words coupled with photos and video.

Since defendant refused to provide plaintiffs with a copy of the video prior to the filing of this lawsuit and has failed to provide this Court with a copy, the motion to dismiss must be denied.

**B.   Defendant's statements are defamatory per se, not per quod, or, at a minimum, are ambiguous, requiring that the question of defamatory meaning be submitted to a jury.**

**1.   Plaintiffs have not asserted a claim for libel per quod.**

While the thrust of defendant's motion is that the television news report is not capable of a defamatory meaning, defendant argues that at best, the complaint only asserts a claim for defamation per quod and must be dismissed because plaintiffs did not plead special damages. This contention should be addressed initially since the motion should be granted if the complaint only asserts a claim for defamation per quod.

Defendant asserts that the claim is for defamation per quod because in order to allege a claim for defamation, plaintiffs must rely on the District Attorney's statement about Burke and evidence of an intruder – facts extrinsic to the televised news report. Def.'s Memo. at 23. Defendant's assertions in this regard improperly confuse the proof of falsity issue in a defamation case with the libel per se/per quod analysis.

Under Georgia law, "[w]hether stated directly or by

- 12 -

implication or innuendo, it is libelous per se to falsely state that a person is guilty of a crime or has a criminal case pending against them." Harcrow v. Struhar, 236 Ga. App. 403, 404 (1999), citing Mead v. True Citizen, Inc., 203 Ga. App. 361, 362, 417 S.E.2d 16 (1992); Melton v. Bow, 241 Ga. 629, 630-631, 247 S.E.2d 100 (1978); Witham v. Atlanta Journal, 124 Ga. 688, 53 S.E. 105 (1906); Southland Corp. v. Garren, 135 Ga. App. 77, 79, 217 S.E.2d 347 (1975), rev'd on other grounds, 235 Ga. 784, 221 S.E.2d 571 (1976).

"Libel per se consists of a charge that one is guilty of a crime, dishonesty or immorality." Zarach v. Atlanta Claims Assoc., 231 Ga. App. 685, 688, 500 S.E.2d 1, (1998), quoting Barber v. Perdue, 194 Ga. App. 287, 288, 390 S.E.2d 234 (1989). Slander per se includes imputing to another a crime punishable by law. O.C.G.A. § 51-5-4. "Defamatory words which are actionable per se are those recognized as injurious on their face – without the aid of extrinsic proof. However, if the defamatory character of the words [does] not appear on their face but only become[s] defamatory by the aid of extrinsic facts, they are not defamatory per se, but per quod and are said to require innuendo." Macon Telegraph Pub. Co. v. Elliott, 165 Ga. App. 719, 723, 302 S.E.2d 692 (1983). Plaintiffs who allege libel per se do not need to plead or prove special damages.

Hoffman-Pugh v. Ramsey, 193 F.Supp.2d at 1299.

Statements that are libelous per quod require information other than that included in the statement in order to render them injurious. Macon Telegraph, 165 Ga. App. at 723. In other words, unless the reader is made aware of some other outside fact, the statement at issue will appear innocent. For example, in Newcombe v. Adolf Coors Co., 157 F.3d 686 (9th Cir. 1998), the plaintiff, a former major league baseball player, sued the defendants for publishing a beer advertisement which contained a drawing which allegedly depicted the plaintiff. The plaintiff was a recovering alcoholic. The plaintiff alleged that the drawing which included his image in a beer commercial was defamatory because it portrayed him as endorsing beer. The Court held that the only way the picture could be deemed libelous would be to introduce the explanatory and otherwise unknown fact that the plaintiff was a recovering alcoholic.[1]

---

[1] See also Sack on Defamation, § 2.8.3, explaining the distinction between libel per se and libel per quod: "If, for example, a Mr. Johnson were falsely reported by a newspaper to have withdrawn funds kept in the bank account of the firm of Johnson, Smith and Jones, but in fact, as members of the community knew, Johnson had been thrown out of the firm a month before, in a per se/per quod jurisdiction, Johnson might or might not have a cause of action without proving special damages. The analysis is as follows: the statement's defamatory meaning can be understood only by reference to the extrinsic fact that Johnson is no longer with the firm. It is libel per quod."

Here, plaintiffs' claim is that the television news report makes false accusations that link plaintiffs to a brutal murder of a family member. Thus, the complaint states a claim for libel per se. The rule urged by defendant would require proof of special damages in <u>all</u> defamation cases by labeling the need to show truth or falsity of a statement as "the need to rely on extrinsic facts." In this case, no extrinsic facts are necessary for a reasonable viewer to conclude that the statements about plaintiffs are injurious if there was good reason to suspect plaintiffs of involvement in a brutal murder of a family member or if after six years of investigation, there was no evidence that linked an intruder to the murder. Here, the statements at issue are defamatory <u>on their face</u> and plaintiffs do not need to plead or prove special damages.

### 2. The broadcast is defamatory per se as it conveyed that plaintiffs were legitimate murder suspects.

The statements at issue in the television news report convey to the average viewer that plaintiffs had been or remained <u>legitimate</u> murder suspects, "DETECTIVES SAY THEY HAD GOOD REASON TO SUSPECT THE RAMSEYS". This accusation is defamatory per se.

This instant case is directly on point with <u>Harcrow v. Struhar</u>, 236 Ga. App. 403, 511 S.E.2d 545 (1999), a decision

defendant failed to mention in its motion and supporting memorandum. In Harcrow, the defendant delivered a flyer to residences throughout his neighborhood stating:

> NEIGHBORHOOD ALERT. SOMEONE HAS SHOT MY CAT!! Hello, Friends and Neighbors. Well, it used to be that your neighbors were your friends, but that is apparently not always true. On Thursday, I had to rush my bleeding kitty to the emergency vet clinic where the Veterinarian diagnosed my cat as being the victim of a gunshot wound. Now, the only people in the neighborhood who have expressed hatred for cats are John and Mary Ellen Struhar, and I'm not saying that they are responsible for this atrocious act, that will be determined by the Smyrna Police, but they are the prime suspects ... And, really, such an act of violence would be in character for someone driven by hatred."

Id. at 403. The plaintiffs testified that the writing was false, that they did not shoot or harm the defendant's cat and that they had never expressed a hatred of cats. Id.

In examining the statements at issue, the Harcrow Court reasoned, "the writing as a whole could be reasonably construed to imply that the [plaintiffs] shot [defendant's] cat and were therefore guilty of the crime of cruelty to animals." The Harcrow Court concluded that the evidence presented by the plaintiffs was "clearly sufficient" for a jury to conclude that the writing published by the defendant was "defamation tending to injure the [plaintiff's] reputation or expose them to public

hatred, contempt, or ridicule." *See also* the unpublished opinion of Judge Carnes in Wolf v. Ramsey, 1:00-CV-1187-JEC denying a motion to dismiss where defendants had named the plaintiff as "on our suspect list."

The fact that the broadcast attributes the statement(s) to unidentified "detectives" does not render the statement non-defamatory or non-actionable. One who republishes a defamatory statement is just as liable as the originator. Baskin v. Rogers, 229 Ga. App. 250, 252, 493 S.E.2d 728, 730 (1997) (where defendant claimed that she had only told others that she had heard rumors that plaintiff was having an extramarital affair, not that it was true, the court quoted Ivester v. Coe, 33 Ga. App 620(1), 127 S.E. 790 (1925) and held, "'[t]alebearers are as bad as talemakers.' Every repetition of a slander originated by a third person is a willful publication of it, rendering the person so repeating it liable to an action and it is no defense that the speaker did not originate the slander, but heard it from another, even though he in good faith believed it to be true.'".

When a person repeats a slanderous charge, even though identifying the source or indicating it is merely a rumor, this constitutes republication and has the same effect as the

original publication of the slander.[2] Ringler Assoc., Inc. v. Maryland Cas. Co., 80 Cal. App.4th 1165, 1180, 29 Media L. Rep 1033 (1st Dist. 2000). See also Cianci v. New York Times Pub. Co., 639 F.2d 54, 60-61 (2d Cir. 1980).

In an effort to avoid some of the obvious ramifications of the statement, "DETECTIVES SAY THEY HAD GOOD REASON TO SUSPECT THE RAMSEYS", defendant contends that the televised news report does not label Burke a suspect, as the statement can only be construed to refer to John and Patsy Ramsey (thus, making it actionable as to them). Defendant argues that it is clear that Burke is not included in the group charged with wrongdoing, "the Ramseys," because the term "the Ramseys" is used loosely in other segments of the television news report "as a reference to John and Patsy Ramsey - exclusive of Burke." Def.'s Memo. at 17. Thus, defendant asserts that this statement is not "of and concerning" Burke.

On a motion to dismiss, the issue for this Court is not whether the Court regards the language as libel or defamacast, but whether it is reasonably susceptible to such construction.

---

[2] See Alianza Dominicana, Inc. v. Luna, 229 A.D.2d 328, 645 N.Y.S.2d 28 (1st Dept. 1996) (statements qualified by words such as "they say" or "rumors on the street are" do not protect statements as opinion) Furthermore, defendant does not assert in its motion that the statements in the television news report are non-actionable opinion.

Southward v. Forbes, Inc., 588 F.2d 140, 143 (5th Cir. 1979); Strange v. Henderson, 223 Ga. App. 218, 220 (1996). In doing so, this Court should not interfere with the jury's role by treating as non-defamatory, a statement that a reasonable juror may fairly conclude in context is defamatory. Mead v. True Citizen, Inc., 203 Ga. App. 361, 362 (1992) ("As a general rule ... whether the published statement was defamatory, is a question for the jury"). See also Southern Co. v. Hamburg, 220 Ga. App. 834, 838-839, 470 S.E.2d 467, 471 (1996) ([i]f [a statement] is capable of two meanings, one of which would be libelous and actionable and the other not, it is for the jury to say, under all the circumstances surrounding its publication, including extraneous facts admissible in evidence, which of the two meanings would be attributed to it by those to whom it is addressed or by whom it may be read.") quoting Ledger-Enquirer Co. v. Brown, 214 Ga.422, 424, 105 S.E.2d 229 (1958).

At a minimum, the scope of the phrase "the Ramseys" is ambiguous and must be determined by a jury. And the ambiguity is the direct and sole result of defendant's calculated choice of the words to be spoken in the television news report.

The broadcast begins with reference to lawsuits that have been brought against people who called Burke a suspect. It then immediately thereafter states that "the Ramseys" have

successfully sued tabloid and mainstream media for defamation.
Thus, a reasonable juror could conclude that the use of the term
"the Ramseys" did in fact include Burke.

Also, immediately before the statement "DETECTIVES SAY THEY
HAD GOOD REASON TO SUSPECT THE RAMSEYS", the news report says
that it "soon became clear who the authorities suspected" and
then runs a video of a former Boulder detective stating that
"probable [sic] cause existed to arrest Patsy Ramsey." But
defendant chose not to thereafter state "DETECTIVES SAY THEY HAD
GOOD REASON TO SUSPECT PATSY RAMSEY."

And defendant chose not to state "DETECTIVES SAY THEY HAD
GOOD REASON TO SUSPECT JOHN AND PATSY RAMSEY." In fact, after
the statement "DETECTIVES SAY THEY HAD GOOD REASON TO SUSPECT
THE RAMSEYS," the broadcast immediately refers to "the couple
and JonBenet's nine year old brother, Burke." [Emphasis
supplied]. By only emphasizing the words "the couple" in its
supporting memorandum, defendant argues that the term "the
Ramseys" in the first sentence can only be interpreted to refer
to John and Patsy Ramsey. This argument requires one to
completely disregard all of the actual words spoken: "the couple
and JonBenét's nine year old brother." [Emphasis supplied].

Defendant also asserts that the statement that Burke has
"been cleared," prevents the news report from being capable of

- 20 -

the defamatory meaning that Burke Ramsey had been a murder
suspect. In fact, a reasonable juror could interpret the use of
that phrase as totally consistent with the impression that Burke
was at some point in time suspected of being involved in the
murder but was subsequently cleared. The idea that an individual
has "been cleared" reasonably conveys, among other things, that
one was at some point a suspect in connection with a crime.
Coupled with the statement that "police say that had good reason
to suspect the Ramseys... the couple and their nine year old
son," clearly justifies a jury finding that that Burke is
included in the phrase, "the Ramseys" and thus, was at some
point in time a murder suspect.

Defendant chose to repeatedly intermingle Burke in a 2 1/2
minute television broadcast which is highly accusatory of "the
Ramseys." Only a jury can resolve the ambiguity as to whether
the impact of the broadcast as a whole conveyed that Burke had
at some point in time been a murder suspect. See Southern Bell
Tele. & Tele. Co. v. Coastal Transmission Service, Inc., 167 Ga.
App. 611, 614 (1983). ("One publication can libel more than one
party, and each party libeled may bring an action." And holding
that whether an ambiguous publication libeled more than one
identified party was a question for the jury.).

**2.    The television news report is defamatory per se as it conveys that one or more of the plaintiffs was likely involved in the murder.**

The television news report conveyed that one or more of the plaintiffs was likely involved in the brutal murder of a family member when it stated that, "DETECTIVES SAY THEY HAD GOOD REASON TO SUSPECT THE RAMSEYS. THE COUPLE AND JONBENET'S NINE YEAR OLD BROTHER, BURKE, WERE THE ONLY KNOWN PEOPLE IN THE HOUSE THE NIGHT SHE WAS KILLED ... WHOMEVER KILLED HER SPENT A LONG TIME IN THE FAMILY HOME, YET THERE HAS NEVER BEEN ANY EVIDENCE TO LINK AN INTRUDER TO HER BRUTAL MURDER."[3]

Here, while the accusation of guilt is admittedly implied, it is a strong implication and dominates the broadcast. It is difficult to conceive of a viewer of this 2 1/2 minute broadcast coming away from viewing it thinking anything other than, "one or more of the Ramseys in that house that night just had to be involved in the murder. After all, they are the only people known to have been in the house and whomever murdered the child had to be in the home a long time. And yet after six years of investigation, there has never been any evidence that links an

---

[3] Defendant seeks in its motion to re-write the transcript of the broadcast in a self-serving fashion by asserting that the news report stated that there had never been any evidence "to link an actual, identifiable intruder to the crime" or to "an actual person." Def.'s Memo. at 21-22. These phrases were not spoken in the report.

intruder to the murder. It just had to be someone in the family." Certainly, this Court cannot exclude an average juror from reaching that or a similar conclusion from the broadcast as a matter of law. It is not a strained construction; to the contrary, it is reasonable interpretation from the plain, natural and ordinary meaning of the words used. *See* <u>Garland v. State</u>, 211 Ga. 44, 46 (1954).

The words spoken in the television news report are strikingly close to those used in the defamatory flyer in <u>Harcrow</u>:

| <u>Harcrow</u>: | ... the only people in the neighborhood who have expressed a hatred for cats are [plaintiffs]. |
|---|---|
| *Ramsey Report:* | *[Plaintiffs were]...the only known people in the house the night she was killed.* |
| <u>Harcrow</u> | ...such an act of violence would be in character for someone driven by hatred. |
| *Ramsey Report:* | *Police say they had good reason to suspect the Ramseys... Whomever killed her spent a long time in the family home, yet there has never been any evidence to link an intruder to her brutal murder.* |

<u>Harcrow</u> at 403.

Defendant seeks to avoid this obviously defamatory accusation against plaintiffs by claiming that the television news report as a whole is non-defamatory because it "clearly

states that the authorities are attempting to develop the intruder theory with the hope of linking an intruder to the crime" and "makes clear" that it "is no longer the case" that John and Patsy Ramsey are "the prime suspects." Def.'s Memo. at 4, 22. Plaintiffs submit that if given the opportunity to review the actual video of the television news report, the Court will quickly conclude that it is defendant who is urging a construction of the report that is "'so farfetched, forced and strained' that is has no real relationship to 'the remaining statements in the report.'" *See* Def.'s Memo. at 22-23. The report *never* stated that John and Patsy Ramsey were no longer suspects. Indeed, the December 27 television news report has John Ramsey stating "we were the prime suspects on December 26" (without stating a calendar year) followed by the defendant's statement "that *may* change." The report ends with a statement that "whether fresh eyes brings fresh answers remains to be seen." There is no statement in the news report that John and Patsy Ramsey are no longer the prime suspects and the news report says nothing about authorities attempting to develop the intruder theory with the hope of linking an intruder to the crime. At best the broadcast states that District Attorney Keenan "promises to investigate new leads and potential suspects." The broadcast does not exclude plaintiffs from being

- 24 -

the subjects of the "new leads" or the plaintiffs as being "potential suspects." The word intruder is only used once in the broadcast and that is in the false statement that "there has never been any evidence to link an intruder" to the brutal murder.

Even if portions of the broadcast could be arguably construed as being exculpatory, Harcrow ("I'm not saying that they are responsible for this atrocious act...") makes clear that such statements do "not negate other portions of the [broadcast] that the jury was entitled to conclude were the equivalent of imputing a crime to [plaintiffs]." Harcrow, 236 Ga. App. at 404. Where the communication is susceptible of both a defamatory and non-defamatory meaning, a question of fact exists for the jury. Southard, 588 F.2d at 143 (citing Holmes v. Clisby, 118 Ga.820, 822 (1903); Shely v. Southern Newspapers, Inc., 87 Ga. App. 167, 171 (1952).

Defendant relies heavily on this Court's opinion in Hoffman-Pugh v. Ramsey, 193 F.Supp.2d 1295 (N.D.G.A. 2002), aff'd, 312 F.3d 1222 (11th Cir. 2002) for the proposition that the news report is not capable of a defamatory meaning. Hoffman-Pugh is factually distinguishable from this case for several reasons. First, in Hoffman-Pugh, the book at issue named seven possible leads or pieces of evidence which the Ramseys felt

should be further investigated in the murder of their daughter. Second, the book listed fifteen individuals as potential suspects. Third, the book included a profile of the killer that clearly did not implicate the plaintiff. Lastly, the book did not create a general impression that plaintiff was a murder suspect.

Defendant's reliance on Southard v. Forbes, 588 F.2d 140 (5th Cir. 1979) reh'g denied, 590 F.2d 333 (1979), cert. denied, 44 U.S. 832, 100 S. Ct. 62 (1979), a summary judgment case decided on a full factual record, is likewise misplaced. In Southard, the plaintiff's claim for libel per se was rejected based on the fact that nothing contained in the statements at issue mentioned an actual crime or made out any elements for violating any law. With respect to the statement "[i]f [plaintiff] made claims like that for stocks, [plaintiff] would be in the soup. But there is no Securities & Exchange Commission for classic cars," the Southard Court held "...nothing on the face of the article explicitly accuses [plaintiff] of violating federal securities law ... nor do the activities explicitly attributed to [plaintiff] on their face make out the elements of a securities law violation." The present case is clearly distinguishable from Southard where no crime was alleged, named,

or mentioned. Here, the television news report in its entirety concerns a brutal murder of a child.

### V.   Conclusion

For the reasons set forth in this response, the television news report broadcast by defendant is capable of a defamatory per se meaning as to all plaintiffs. Accordingly, defendant's Motion to Dismiss should be denied.

This the 8th day of June, 2004.

**L. LIN WOOD, P.C.**

L. Lin Wood
Ga. State Bar No. 774588

Katherine M. Ventulett
Ga. State Bar No. 727027

Suite 2140
The Equitable Building
100 Peachtree Street, NW
Atlanta, Georgia 30303
404/522-1713

Attorneys for Plaintiffs

## CERTIFICATION OF COUNSEL

Pursuant to N.D. Ga. Local Rule 7.1 D, I hereby certify that this document is submitted in Courier New 12 point type as required by N.D. Ga. Local Rule 5.1(b).


_____
L. LIN WOOD

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

JOHN BENNETT RAMSEY and                    )
PATRICIA PAUGH RAMSEY,                      )
                                           )
    Plaintiffs,                           )       CIVIL ACTION FILE
                                           )
vs.                                        )       NO. 1 03 CV-3976 (TWT)
                                           )
FOX NEWS NETWORK, L.L.C.,                   )
                                           )
    Defendant.                            )
                                           )

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the within and foregoing PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS upon Defendant's counsel and depositing same in the United States Mail, postage prepaid and addressed to:

        Mr. Judson Graves
        Ms. Jennifer (Jenna) Moore
        Alston & Bird, LLP
        One Atlantic Center
        1201 W. Peachtree Street
        Atlanta, Georgia 30309-3424

        Ms. Dori Ann Hanswirth
        Mr. Jason P. Conti
        Hogan & Hartson, L.L.P.
        873 Third Avenue
        New York, NY 10022

This 8th day of June, 2004.

**L. LIN WOOD, P.C.**

L. Lin Wood
Ga. State Bar No. 774588

Suite 2140
The Equitable Building
100 Peachtree Street, NW
Atlanta, Georgia 30303
404/522-1713
404/522-1716 Fax

Attorneys for Plaintiffs

- 2 -